IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )        No. 14-cr-20135-STA-tmp
                                    )
JOHNNY GRAHAM,                      )
                                    )
        Defendant.                  )
                                    )

_____

REPORT AND RECOMMENDATION

_____

On March 7, 2014, police officers with the Memphis Police Department ("MPD") conducted a traffic stop on a vehicle driven by defendant Johnny Graham. During the stop, the officers learned that Graham had a suspended license and that he was on federal supervised release. After the officers placed Graham under arrest, they conducted a search of the vehicle, at which time they found two firearms in a backpack located behind the driver's seat. Graham subsequently waived his Miranda rights and gave a statement admitting to possession of the firearms. On May 27, 2014, a federal grand jury returned a two-count indictment charging Graham with being a felon in possession of the firearms, in violation of 18 U.S.C. § 922(g)(1).

On July 23, 2014, Graham filed a Motion to Suppress. (ECF No. 23.) The government filed a response in opposition on

August 6, 2014. (ECF No. 27.) The motion was referred to the undersigned Magistrate Judge for a hearing and submission of a report and recommendation. The court held a suppression hearing on September 18, 2014.[1] The government called as witnesses MPD Officers Benjamin Dawson and Milton Gonzalez. Graham, in addition to offering his own testimony, called as witnesses MPD Officers Jeremy Montgomery and Mark Scarborough, Jernard Graham (his brother), and Michael Graham (his cousin). The court received into evidence a copy of Chapters 11-4 and 11-40 of the Code of Ordinances for Memphis, Tennessee; photographs depicting the position of Graham's vehicle immediately following his arrest and the firearms seized from the vehicle; numerous photographs of the intersection where the vehicle was stopped; a copy of the MPD's "Tow-In" policy; a copy of a blank MPD "hold harmless" form; the arrest ticket describing the events surrounding Graham's arrest on March 7, 2014; a MPD "Towed/Recovered Report" for the vehicle; registration information for the vehicle; the Miranda rights waiver form signed by Graham and his post-arrest statement; and a recording of a jail call made by Graham after his arrest.

Based upon the evidence presented at the hearing and the applicable law, the court submits the following proposed

_____

[1]The hearing was originally scheduled for August 27, 2014, but was continued to September 18 upon the request of the parties.

findings of fact and conclusions of law, and recommends that the Motion to Suppress be denied. In reaching these proposed findings and recommendation, the court credits the testimony of the MPD officers over the testimony of Graham and his non-law enforcement witnesses.

## I.    PROPOSED FINDINGS OF FACT

### A.    Vehicle Stop and Inventory Search

On March 7, 2014, MPD Officers Benjamin Dawson and Mark Scarborough were working the 7:00 a.m. to 3:00 p.m. shift. At the beginning of their shift, Lieutenant Labonn Lawson conducted a roll call and briefed the officers as to recent crimes in the precinct. The officers were told that a large number of residential burglaries had occurred recently in the early morning hours in the area of the city north of St. Elmo Avenue and west of Range Line Road. At around 8:45 a.m. that morning, Officers Dawson and Scarborough were in Officer Dawson's police vehicle patrolling the general area where the rash of burglaries had occurred.[2] As Officer Dawson turned east onto Rammesses Drive, he pulled behind a silver Mercedes that was traveling in the same direction. Officer Dawson was twenty to thirty feet behind the Mercedes, which was traveling about thirty miles per hour. Officer Dawson observed that the driver of the Mercedes

---

[2]This location was approximately half a mile south of the high-burglary area.

was not wearing a seatbelt. Specifically, Officer Dawson testified that he could see through the back window of the Mercedes that "the seatbelt strap was following the contour of the vehicle, not being pulled across the subject's body." (Hr'g Tr. Vol. I at 14.) Although Graham testified that he was, in fact, wearing his seatbelt at the time the officers pulled him over, the court finds Officer Dawson's testimony to be credible and Graham's testimony to be not credible on this factual dispute.[3]

Officer Dawson turned on his blue lights to initiate a vehicle stop. The Mercedes turned right onto Wagon Wheel Drive and came to a stop just before reaching the intersection with Redvers Avenue. At the time the Mercedes came to a stop, it was parked over twelves inches away from the curb of the street. Officer Dawson exited his patrol vehicle and approached the Mercedes on the driver's side, while Officer Scarborough approached on the passenger's side. Johnny Graham, the driver, was by himself in the vehicle. Officer Dawson confirmed upon approaching Graham that he was not wearing a seatbelt. Officer Dawson asked to see Graham's driver's license. Graham stated that his license had been suspended, and he instead gave Officer

---

[3]The government introduced into evidence a recorded jail call made by Graham after his arrest. In the recorded call, Graham can be heard discussing his arrest and whether he was wearing his seatbelt. The recording is difficult to understand and does not assist the court in resolving this factual dispute.

Dawson his Tennessee identification card.  Officer Dawson observed that Graham was "very nervous, he was stuttering a lot, rambling, trying to make sure that [Officer Dawson] knew that it wasn't his [Graham's] car."  (Hr'g Tr. Vol. I at 15.)  Officers Dawson and Scarborough observed in the back seat of the vehicle a large flat screen television and a DVD player.  In light of the information conveyed to them during roll call, the officers suspected that the items may have been stolen.  At that point, Officer Dawson removed Graham from his vehicle, patted him down for officer safety, placed him under arrest for driving on a suspended license, and placed him in handcuffs in the back of the patrol car.  According to Officer Dawson, the arrest occurred within five minutes of stopping the vehicle.  Officer Dawson ran a check on Graham's Tennessee identification number, and was able to confirm that Graham's license was suspended and that Graham was on federal supervised release.  Officer Dawson also contacted Graham's probation officer and verified that he was under federal supervision.[4]  Graham told Officer Dawson that the television and DVD player in the vehicle belonged to his brother and that he was taking the items to a pawn shop.

_____

[4]Officer Dawson was able to verify that Graham was not the registered owner of the Mercedes.  Through a records check, Officer Dawson determined that an individual named Isces Williams was the registered owner.

Officer Dawson testified that at that point, he made the decision to tow the Mercedes because it was not legally parked. The officers testified that the vehicle was illegally parked because it was more than twelve inches from the curb, in violation of Memphis City Ordinance 11-40-2(A)(2).[5]  Moreover, photographs taken of the Mercedes and its proximity to the curb show the vehicle parked more than twelve inches from the curb.[6]

The MPD has a written "Tow-In" policy that governs when officers may tow an arrestee's vehicle.  According to the policy:

> When an officer arrests a defendant and the defendant's vehicle is not needed as evidence, the officer is required to allow the defendant to leave the vehicle at the scene of arrest if the defendant so desires and it is legally parked. The defendant cannot, however, park a vehicle on private property without the consent of the property owner/management. The defendant may authorize a third party at the scene who is not under arrest to legally park the vehicle. The defendant will not be allowed to move his vehicle once he has been arrested.  Under no circumstances

---

[5]Graham testified that he was parked not more than eighteen inches from the curb.

[6]Officer Dawson also testified that the Mercedes was illegally parked because it was parked within twenty feet of an intersection, in violation of Memphis City Ordinance 11-40-2(A)(7).  Graham argues, however, that 11-40-2(A)(7) only prohibits parking a vehicle within twenty feet *of a crosswalk* at an intersection, and that the photographs of the intersection at Wagon Wheel Drive and Redvers Avenue reveal that the intersection does not have any "crosswalks" as defined under 11-4-1.  The court need not resolve this dispute, because the court finds that the Mercedes was parked more than twelve inches from the curb in violation of 11-40-2(A)(2).

will an officer on the scene drive the vehicle with or without the owner's consent. These options must be explained to the defendant before the decision to tow is made.

If a vehicle cannot be legally parked, left on private property with permission, or released to a third party, then the vehicle should be towed to the City Impound Lot. A supervisor must be contacted prior to requesting a wrecker. If the vehicle is left at the scene or is released to a third party, a hold harmless agreement must be signed by the defendant. The signed hold harmless agreement should be filed at the precinct with the officer's other paperwork at the conclusion of the shift.

(Ex. 3.)[7]

The officers testified that Officer Dawson called for a tow truck, and while waiting for the tow truck to arrive, the officers performed an inventory search of the Mercedes. Along with the television and DVD player, Officer Dawson found a black backpack on the floorboard behind the driver's seat. The backpack contained barber supplies and two handguns. Once Officer Dawson found the handguns, he called Lieutenant Lawson

_____

[7]The government introduced into evidence a blank copy of the hold harmless agreement referenced in the tow-in policy. It states: "I, _____, understand that I may leave my automobile locked and properly parked on the street, or I may have the City Wrecker remove my automobile to the City Lot at my own expense. I (do or do not) wish to have my automobile removed to the City Lot. In consideration of allowing my automobile to remain parked on the street, I agree to hold the City of Memphis, the Arresting Officers, and the Memphis Police Department harmless from any and all damages or thefts of any kind whatsoever that may occur while my automobile is so parked on the street." (Ex. 4.) However, this agreement is not applicable where the arrestee's vehicle is towed, as was the case here.

to alert him of the situation and also called for one more unit to help secure the scene. Officer Jeremy Montgomery soon arrived on the scene to assist with the traffic stop, and Lieutenant Lawson arrived sometime thereafter. Officers ran the serial number of the television and the vehicle identification number on the Mercedes, and determined that neither had been reported stolen. At some point while Graham was in custody at the scene, he signed a <u>Miranda</u> rights waiver form and provided a written statement admitting to possession of the firearms. The vehicle was later towed to the city impound lot.[8]

At some point during the stop, several individuals approached the officers, including Graham's brother, Jernard Graham, and his cousin, Michael Graham. The officers testified that these individuals did not appear at the scene until after the decision was made to tow the Mercedes and after the officers found the firearms.[9] Specifically, Officer Dawson testified that other individuals arrived on the scene "after we had discovered the two handguns in the back seat and we had Mr. Graham in

---

[8]The receipt attached to the tow ticket shows that an individual named Ayesh Hatin picked up the vehicle from the lot on March 10, 2014. Graham testified that he purchased the vehicle from Hatin, and that the previous owner was Isces Williams.

[9]Officer Scarborough testified that at the beginning of the traffic stop, he observed an elderly man standing outside a residence several houses down from the scene of the stop. However, there is no evidence that this man was connected to Johnny Graham, Jernard Graham, or Michael Graham.

custody and we were finishing up our paperwork and waiting on the wrecker to show up." (Hr'g Tr. Vol. I at 30.) Officer Dawson continued:

> **Q.** Now, there was testimony about individuals coming to the scene, correct?
>
> **A.** Yes, ma'am.
>
> **Q.** Individuals that you had not had any contact prior to this incident, correct?
>
> **A.** Correct.
>
> **Q.** And at the time these individuals were coming to the scene, had you already conducted a search?
>
> **A.** Yes, ma'am.
>
> **Q.** And as displayed in Exhibit 2, had you already recovered the firearms?
>
> **A.** Yes, ma'am.
>
> **Q.** Were they placed on the hood of the car?
>
> **A.** Not when the subjects were walking up, we had them inside the patrol vehicle.
>
> **Q.** You had already removed those from the vehicle?
>
> **A.** Yes, ma'am.
>
> **Q.** But all the items that were the subject -- or which is the subject of this motion to suppress, these two firearms had already been recovered by you?
>
> **A.** Yes, ma'am.

(Hr'g Tr. Vol. I at 96-97.)

> **Q.** Officer Dawson, the individuals, how many did you say there were that were walking up and down?
>
> **A.** Approximately five.

**Q.** About five. When did you first notice them?

**A.** As I was walking around the vehicle making sure we had gotten everything or seen everything we needed to see out of the vehicle. I was typing the narrative on the report, filling in the information for the arrest ticket.

**Q.** Okay. So when you first pull over Johnny Graham and he stops at the corner of Redvers and Wagon Wheel, there are not any individuals outside there at that very moment?

**A.** That's correct.

**Q.** And when you are talking to Johnny Graham while he's still seated in the driver's seat of the vehicle and Officer Scarborough is on the passenger's side, do you see any individuals at that point?

**A.** No, sir.

**Q.** After you put the handcuffs on Johnny Graham and escort him to the squad car, at that point, did you see any individuals?

**A.** No, sir.

**Q.** And then while Johnny Graham was in the back of the squad car, that's when you and Officer Scarborough proceeded to do the search of the vehicle, right, leading up to the tow?

**A.** No, we called for the tow first and then began the inventory.

**Q.** While you were doing the inventory, before the wrecker arrived, did you notice any individuals at that point?

**A.** No, sir.

**Q.** And after you had completed the inventory, taken all the crime scene photos and other pictures that we introduced earlier, while you were taking those pictures, did you see anybody?

**A.** While I was taking the photos, no.

**Q.** So when the individual, maybe it was more than one that came up to you and said something to the effect of I know Mr. Graham, what's going on -- excuse me -- when did that happen exactly, where were you at that moment?

**A.** I was standing next to the squad car typing the report.

**Q.** Okay. And Officer Scarborough was where?

**A.** He was inside the vehicle.

**Q.** And Johnny Graham was in the back seat of the vehicle?

**A.** Yes, sir.

**Q.** And this is before the other officers had arrived, right?

**A.** After.

**Q.** It was after the other officers arrived. So it's possible that the other officers had had some interaction with those other individuals earlier?

**A.** It's possible.

(Hr'g Tr. Vol. I 104-05.)

Officer Scarborough testified regarding the timing of the

individuals' arrival on the scene as follows:

**Q.** Okay. And while you are searching the vehicle and logging things down, did you see any other individuals come up to the car and talk to you or Officer Dawson or Officer Montgomery?

**A.** I believe it was after that, after we had already searched the stuff, people were coming by.

(Hr'g Tr. Vol. II at 34.)  Officer Montgomery also testified that these individuals did not arrive on the scene until after the inventory search was completed:

> **Q.** So many things going on, what else was going on? Were you aware of any other individuals, other people that were around at that time?
>
> **A.** At the time that I got there and saw them put him in the car, no.
>
> **Q.** When did you first see other people walking around and on the scene?
>
> **A.** We had already inventoried the car and inventoried the contents and found the weapons in there and then secured them and then sat back down in the car. At some point, somebody came up and tried to speak to Officer Dawson in his car.

(Hr'g Tr. Vol. I at 125.)

According to the officers, once the individuals arrived on the scene, some of them began to ask the officers about the traffic stop and Graham's arrest.  Officer Dawson testified as follows:

> **Q.** All right. Let's talk about the individuals you said were walking up and down the streets, how many people did you see from the time you were interacting with Mr. Johnny Graham both at his vehicle and then later, I suppose, when he was in the back of the squad car, how many individuals were walking up and down the street?
>
> **A.** I would say around five or six.
>
> **Q.** And describe these individuals to us.
>
> **A.** Male black subjects dressed as most people in that neighborhood dress.

**Q.** Okay. But I mean did they approach you and talk to you at all?

**A.** They asked what was going on. They said, hey, I now this guy, what have you got him in the back seat for, can I talk to him.

**Q.** Okay. So did they identify who they were, though, did they say I am so and so?

**A.** No.

**Q.** And did Mr. Graham, did he say, hey, that's so and so, did he ever tell you who that person is?

**A.** Not to me, no.

**Q.** Okay. When the individuals came up to you and said -- and questioned you about what was going on, was Johnny Graham already in the back of the squad car?

**A.** Yes.

**Q.** And at that point, the windows up, down, do you remember?

**A.** In the squad car?

**Q.** Yeah.

**A.** They were up.

**Q.** They were up.  Is it your testimony that you never had a conversation with Mr. Graham at all about who those people were?

**A.** I don't remember having a conversation.

                         . . . .

**Q.** Okay. To your knowledge, did Officer Scarborough ever talk with those individuals?

**A.** Yes, sir.

**Q.** He did?

**A.** Yes, sir.

**Q.** Do you know what that conversation entailed?

**A.** He told them to clear the scene.

**Q.** He told them to get lost?

**A.** Yes, sir.

(Hr'g Tr. Vol. I at 83-89.)  At that point, Officer Dawson testified that the individuals left the immediate location of the arrest and "then basically prowled back and forth the entire time of the stop."  (Hr'g Tr. Vol. I at 90.)  Officer Montgomery heard one of the individuals ask Officer Dawson if he could take Graham's vehicle from the scene, and Officer Dawson told him that he could not.  According to Officer Montgomery, the individuals then gathered at a neighbor's house while the officers waited for the tow truck.

Contrary to the testimony of the officers, the defense witnesses testified that they approached the officers before Graham was placed in the patrol car, that prior to the inventory search, the defendant's brother, Jernard Graham, asked the officers if he could take possession of the Mercedes, and that Johnny Graham asked the officers to allow Jernard Graham to take the vehicle.  Jernard Graham testified that he lived at 2504 Rammesses with the defendant and their cousin, Christopher

Graham.[10]  Jernard Graham was in his bedroom on the morning of March 7 when Christopher Graham told him that the police had pulled over the defendant around the corner.  Jernard Graham testified that he and Christopher Graham walked to the corner of Wagon Wheel Drive and Redvers Avenue, where he (Jernard) saw Johnny Graham standing outside of Officer Dawson's patrol car, in the process of being arrested.  Jernard Graham asked one of the officers what Johnny Graham was being arrested for, to which the officer responded, "he is a big boy, he can handle his own issues, you go ahead on."  (Hr'g Tr. Vol. II at 50.)  Johnny Graham testified that he told the officers that Jernard was his brother when Jernard Graham initially approached the officers. Jernard Graham then walked to a neighbor's house across the street and observed the arrest from a distance.  About thirty minutes to an hour later, Jernard Graham once again approached the officers and asked them if he could take the car so that it would not be impounded.  The officers told him that he could not.  According to Jernard Graham, the officers did not search the vehicle until after they had told him that he could not take the vehicle.  Johnny, Jernard, and Michael Graham all testified that the family members arrived on the scene before the officers searched the Mercedes.

---

[10]The arrest ticket identified Graham's address as 2504 Rammesses, approximately one block away from the scene of his arrest.

The court has carefully considered the testimony of all of the witnesses. The court credits the officers' testimony that Graham's family members did not arrive on the scene until after the officers had made the decision to tow the vehicle and after the firearms were found in the backpack. The court finds the testimony of the defense witnesses to be not credible.

**B.   Motion to Suppress**

In his Motion to Suppress, Graham argues that the officers did not have probable cause or reasonable suspicion to stop him for committing a traffic violation. Graham also asserts that the Mercedes was parked legally on the street, and therefore the officers had no basis to tow the vehicle pursuant to the MPD's tow-in policy. Finally, he argues that the officers failed to explain to him that he could have a third party retrieve the vehicle, thereby violating the tow-in policy and invalidating the inventory search of the vehicle. As a result, Graham argues that all evidence obtained as a result of the invalid traffic stop, arrest, and search of the vehicle must be suppressed.[11]

## II.   PROPOSED CONCLUSIONS OF LAW

**A.   The Traffic Stop**

---

[11]Graham's argument for suppressing his post-arrest statement is based solely on the fruit of the poisonous tree doctrine, i.e., that the statement was obtained as a result of the unlawful search. See Wong Sun v. United States, 371 U.S. 471, 491 (1963); see also Brown v. Illinois, 422 U.S. 590, 603 (1975).

The Fourth Amendment states in pertinent part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. A stop of a vehicle is a seizure and is accorded Fourth Amendment protections. United States v. Sharpe, 470 U.S. 675, 682 (1985); Delaware v. Prouse, 440 U.S. 648, 663 (1979). "Any evidence seized during an illegal traffic stop must be suppressed as fruits of the poisonous tree." United States v. Love, No. 11-20105-STA-CGC, 2012 WL 3887065, at *6 (W.D. Tenn. Sept. 6, 2012) (quoting United States v. Jackson, 682 F.3d 448, 453 (6th Cir. 2012)). However, a police officer may lawfully stop a vehicle when he or she has probable cause to believe that a civil traffic violation has occurred, or reasonable suspicion of an ongoing crime. United States v. Street, 614 F.3d 228, 232 (6th Cir. 2010) ("[T]here is nothing unreasonable about stopping a vehicle whose driver has just committed a traffic violation."); Gaddis ex rel. Gaddis v. Redford Twp., 364 F.3d 763, 771 n.6 (6th Cir. 2004). It is well-settled that a driver's failure to wear a seatbelt can establish probable cause to justify a traffic stop. Love, 2012 WL 3887065, at *6 (citing Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001); Street, 614 F.3d at 232 (upholding the legality of a traffic stop made for a

seatbelt violation); United States v. Canipe, 569 F.3d 597, 601 (6th Cir. 2009)).  Here, the officers had probable cause to conduct the traffic stop of Graham's vehicle.  Officer Dawson personally observed Graham not wearing his seatbelt, and as such, had probable cause to believe that Graham had committed a traffic violation.  See Love, 2012 WL 3887065, at *6.  Therefore, the traffic stop was valid under the Fourth Amendment.

## B.   The Inventory Search

An inventory search of a vehicle conducted without a warrant does not violate the Fourth Amendment.  Colorado v. Bertine, 479 U.S. 367, 371-74 (1987).  Warrantless inventory searches may be conducted when police lawfully take custody of a vehicle.  United States v. Smith, 510 F.3d 641, 651 (6th Cir. 2007).  However, an inventory search of a vehicle must be conducted "according to standard police procedures" and may not be undertaken "for purposes of investigation."  United States v. Lumpkin, 159 F.3d 983, 987 (6th Cir. 1998); see also United States v. Tackett, 486 F.3d 230, 232 (6th Cir. 2007).[12]  "In

---

[12]At the suppression hearing, Graham argued that the inventory search of the vehicle was unlawful because it was pretextual, citing Colorado v. Bertine, 479 U.S. 367 (1987) and United States v. Tackett, 486 F.3d 230, 232 (6th Cir. 2007).  Graham argued that the search was actually motivated by the officers' desire to investigate the possible theft of the television and DVD player, and as such, violated the Fourth Amendment.  However, "officers' suspicion that they may find contraband does

conducting an inventory search, officers do not enjoy their accustomed discretion; they simply follow the applicable policy." <u>Tackett</u>, 486 F.3d at 232 (citing <u>Florida v. Wells</u>, 495 U.S. 1, 4 (1990) (stating that police must follow an established routine, not engage in "rummaging")).

The facts of this case are similar to those in <u>United States v. Landon</u>, 449 F. App'x 500 (6th Cir. 2011). In <u>Landon</u>, MPD officers stopped Landon for driving with tags registered to another vehicle. <u>Id.</u> at 501. After the officers signaled for Landon to pull over, he illegally parked his vehicle on private property, partially blocking the sidewalk. <u>Id.</u> During the course of the stop, officers learned that Landon's license had been suspended and he did not have automobile insurance. <u>Id.</u> Because Landon was unable to legally move his vehicle, the officers placed him under arrest. <u>Id.</u> After Landon was taken into custody, the police performed an inventory search of Landon's vehicle and found a weapon and ammunition. <u>Id.</u> The MPD's tow-in policy in <u>Landon</u> was identical to the tow-in policy in effect in the instant case:

> When an officer arrests a defendant and the defendant's vehicle is not needed as evidence, the officer is required to allow the defendant to leave the vehicle at the scene of arrest if the defendant so desires and it is legally parked. The defendant cannot, however, park a vehicle on private property

not invalidate an otherwise proper inventory search." <u>Tackett</u>, 486 F.3d at 232 (citing <u>Lumpkin</u>, 159 F.3d at 987).

without the consent of the property owner/management. The defendant may authorize a third party at the scene who is not under arrest to legally park the vehicle. The defendant will not be allowed to move his vehicle once he has been arrested. Under no circumstances will an officer on the scene drive the vehicle with or without the owner's consent. These options must be explained to the defendant before the decision to tow is made.

Id. at 502. Landon moved to suppress the rifle and his statement, arguing that the officers failed to follow the MPD's tow-in policy by failing to explain to him that he could have authorized a third party to legally park the vehicle, and therefore violated his Fourth Amendment rights. Id. The Sixth Circuit rejected this argument:

> The problem with Landon's argument is that the policy's use of the word "options" makes clear that the explanation is required not to inform every defendant of the policy's terms, but to allow a defendant to exercise one of the choices permitted by the policy. Here, neither of the options was available to Landon: he could not leave the vehicle where it was parked because it was parked illegally, and he could not authorize a third party to move the vehicle because there was no third party at the scene. Accordingly, the officers did not violate the policy by failing to explain Landon's nonexistent options to him. Moreover, even if the officers had violated the policy in this way, such a harmless violation would not have invalidated the search. See, e.g., United States v. Mayfield, 161 F.3d 1143, 1145 (8th Cir. 1998) (holding that an inventory search was reasonable, despite the officers' failure to follow every dictate of the applicable policy).

Id. at 502-03. Similarly, in this case, Graham could not leave his car where it was parked because it was parked illegally, i.e. more than twelve inches away from the curb in violation of

Memphis City Ordinance 11-40-2(A)(2). He could not authorize a third party to move the vehicle because at the time the officers made the decision to tow the vehicle, there was no third party at the scene. Therefore, just as in Landon, the officers had no obligation to explain to Graham his non-existent options. Even assuming, *arguendo*, that the MPD's tow-in policy could be construed as creating some obligation on the part of officers to notify an arrestee of his or her options should third parties happen to arrive on the scene before the vehicle is towed, in the instant case Graham's family members did not arrive until *after* the officers found the firearms. Therefore, the firearms were not the fruit of any Fourth Amendment violation.

### III. RECOMMENDATION

For the reasons above, it is recommended that Graham's motion be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

October 24, 2014
Date

### NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**