**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

_____

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14-20135-STA-tmp** |
| | ) | |
| **JOHNNY GRAHAM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**

_____

Before the Court is Defendant Johnny Graham's Motion to Suppress (ECF No. 23) filed on July 23, 2014. This matter was referred to the United States Magistrate Judge for report and recommendation. Pursuant to the order of reference, the Magistrate Judge conducted a suppression hearing on September 18, 2014, and issued his report (ECF No. 46) on October 24, 2014, recommending that the Motion to Suppress be denied. Since that time the parties have filed a number of supplemental briefs, and the Court has received additional evidence on the objections raised by Defendant. For the reasons set forth below, the Court **ADOPTS** in part the Magistrate Judge's report and recommendation but **GRANTS** Defendant's Motion to Suppress.

<u>**BACKGROUND**</u>

**I. Procedural History**

On May 27, 2014, a federal grand jury sitting in the Western District of Tennessee returned an indictment, charging Defendant with two counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Defendant pleaded not guilty to both counts, and the Court appointed the Federal Public Defender to represent Defendant. On July 23, 2014, the

Federal Public Defender filed in the instant Motion to Suppress on Defendant's behalf and represented Defendant at the suppression hearing before the Magistrate Judge on September 18, 2014. The Magistrate Judge issued his report and recommendation on October 24, 2014, recommending that the Motion be denied. Defendant filed timely objections, and on November 14, 2014, submitted a motion to supplement the proof presented at the suppression hearing (ECF No. 54). The United States filed a response (ECF No. 64) to Defendant's objections on December 15, 2014.

On November 11, 2014, Defendant filed the first of two *pro se* motions for new counsel (ECF Nos. 49, 53). Following a hearing on the motions, the Court granted Defendant's request for a new attorney on December 2, 2014, and appointed replacement counsel. Thereafter, counsel for Defendant requested discovery from the United States and with leave of court filed additional objections (ECF No. 70) to the Magistrate Judge's report and recommendation on January 29, 2015. The government filed its own brief in response (ECF No. 71) to Defendant's supplement. Based on the parties' submissions, the Court found cause to receive additional evidence on the issues raised in Defendant's objections to the report. After a number of continuances, the Court convened a limited evidentiary hearing on May 26, 2015, where the Court heard testimony from Officer Benjamin Dawson of the Memphis Police Department, the arresting officer in this case, and Edward Shaw of the United States Probation Office, Defendant's federal probation officer. At the conclusion of the hearing, the parties requested an opportunity to file more briefs, which the Court granted. Both parties have now filed another round of memoranda (ECF Nos. 90, 91), and the issues presented in the Motion to Suppress are ripe for determination.

**II. Factual Background**

Based on the testimony and exhibits received at the suppression hearing, the Magistrate Judge reported the following findings of fact.

**A. Vehicle Stop**

On March 7, 2014, Memphis Police Department (hereinafter "MPD") Officers Benjamin Dawson and Mark Scarborough were working the 7:00 a.m. to 3:00 p.m. shift. At the beginning of the shift, Lieutenant Labonn Lawson conducted a roll call and briefed the officers as to recent crimes in the precinct. The officers were told that a large number of residential burglaries had occurred recently in the early morning hours in the area of the city north of St. Elmo Avenue and west of Range Line Road.

At around 8:45 a.m. that morning, Officers Dawson and Scarborough were in Officer Dawson's police vehicle patrolling the general area where the rash of burglaries had occurred.[1] As Officer Dawson turned east onto Rammesses Drive, he pulled behind a silver Mercedes that was traveling in the same direction. Officer Dawson was twenty to thirty feet behind the Mercedes, which was traveling about thirty miles per hour. Officer Dawson observed that the driver of the Mercedes was not wearing a seatbelt. Specifically, Officer Dawson testified that he could see through the back window of the Mercedes that "the seatbelt strap was following the contour of the vehicle, not being pulled across the subject's body."[2] Defendant maintained that he was, in fact, wearing his seatbelt at the time of the traffic stop. Although Defendant testified that he was, in fact, wearing his seatbelt at the time the officers pulled him over, the Magistrate Judge found Officer Dawson's testimony to be credible and Defendant's testimony to be not

---

[1] This location was approximately half a mile south of the high-burglary area.

[2] Hr'g Tr. Vol. I at 14.

credible on this factual dispute.[3]

Officer Dawson turned on his blue lights to initiate a vehicle stop. The Mercedes turned right onto Wagon Wheel Drive and came to a stop just before reaching the intersection with Redvers Avenue. At the time the Mercedes came to a stop, it was parked over twelves inches away from the curb of the street. Officer Dawson exited his patrol vehicle and approached the Mercedes on the driver's side, while Officer Scarborough approached on the passenger's side. Johnny Graham, the driver, was by himself in the vehicle. Officer Dawson confirmed upon approaching Graham that he was not wearing a seatbelt. Officer Dawson asked to see Graham's driver's license. Graham stated that his license had been suspended, and he instead gave Officer Dawson his Tennessee identification card. Officer Dawson observed that Graham was "very nervous, he was stuttering a lot, rambling, trying to make sure that [Officer Dawson] knew that it wasn't his [Graham's] car." (Hr'g Tr. Vol. I at 15.) Officers Dawson and Scarborough observed in the back seat of the vehicle a large flat screen television and a DVD player. In light of the information conveyed to them during roll call, the officers suspected that the items may have been stolen.

At that point, Officer Dawson removed Graham from his vehicle, patted him down for officer safety, placed him under arrest for driving on a suspended license, and put him in handcuffs in the back of the patrol car. According to Officer Dawson, the arrest occurred within five minutes of stopping the vehicle. Officer Dawson ran a check on Graham's Tennessee identification number and was able to confirm that Graham's license was suspended and that

---

[3] The government introduced into evidence a recorded jail call made by Graham after his arrest. In the recorded call, Graham can be heard discussing his arrest and whether he was wearing his seatbelt. The Magistrate Judge found that the recording was difficult to understand and did not help to resolve the factual dispute over whether Graham was wearing his seatbelt.

Graham was on federal supervised release.  Officer Dawson also contacted Graham's probation officer and verified that he was under federal supervision.   Graham told Officer Dawson that the television and DVD player in the vehicle belonged to his brother and that he was taking the items to a pawn shop.

## B. Decision to Tow and Inventory Search

Officer Dawson was able to verify that Graham was not the registered owner of the Mercedes. Through a records check, Officer Dawson determined that an individual named Isces Williams was the registered owner.  Officer Dawson testified that at that point, he made the decision to tow the Mercedes because it was not legally parked.  The officers testified that the vehicle was illegally parked because it was more than twelve inches from the curb in violation of Memphis City Ordinance 11-40-2(A)(2).[4]  Moreover, photographs taken of the Mercedes and its proximity to the curb show the vehicle parked more than twelve inches from the curb.[5]

The MPD has a written "Tow-In" policy that governs when officers may tow an arrestee's vehicle.  According to the policy:

> When an officer arrests a defendant and the defendant's vehicle is not needed as evidence, the officer is required to allow the defendant to leave the vehicle at the scene of arrest if the defendant so desires and it is legally parked. The defendant cannot, however, park a vehicle on private property without the consent of the property owner/management. The defendant may authorize a third party at the scene who is not under arrest to legally park the vehicle.  The defendant will not be allowed to move his

---

[4] Graham testified that he was parked not more than eighteen inches from the curb.

[5] Officer Dawson also testified that the Mercedes was illegally parked because it was parked within twenty feet of an intersection, in violation of Memphis City Ordinance 11-40-2(A)(7).  Graham argues, however, that 11-40-2(A)(7) only prohibits parking a vehicle within twenty feet *of a crosswalk* at an intersection and that the photographs of the intersection at Wagon Wheel Drive and Redvers Avenue reveal that the intersection does not have any "crosswalks" as defined under 11-4-1.  The Magistrate Judge found it unnecessary to resolve this dispute because he determined that the Mercedes was parked more than twelve inches from the curb in violation of 11-40-2(A)(2).

vehicle once he has been arrested. Under no circumstances will an officer on the scene drive the vehicle with or without the owner's consent. These options must be explained to the defendant before the decision to tow is made.

If a vehicle cannot be legally parked, left on private property with permission, or released to a third party, then the vehicle should be towed to the City Impound Lot. <u>A supervisor must be contacted prior to requesting a wrecker.</u> If the vehicle is left at the scene or is released to a third party, a hold harmless agreement must be signed by the defendant. The signed hold harmless agreement should be filed at the precinct with the officer's other paperwork at the conclusion of the shift.[6]

The officers testified that Officer Dawson called for a tow truck, and while waiting for the tow truck to arrive, the officers performed an inventory search of the Mercedes.

Along with the television and DVD player, Officer Dawson found a black backpack on the floorboard behind the driver's seat. The backpack contained barber supplies and two handguns. Once Officer Dawson found the handguns, he called Lieutenant Lawson to alert him of the situation and also called for one more units to help secure the scene. Officer Jeremy Montgomery soon arrived on the scene to assist with the traffic stop, and Lieutenant Lawson arrived sometime thereafter. Officers ran the serial number on the television and the vehicle identification number on the Mercedes and determined that neither had been reported stolen. At some point while Graham was in custody at the scene, he signed a Miranda rights waiver form and provided a written statement admitting to possession of the firearms. The vehicle was later

---

[6] Ex. 3 to Suppression Hr'g. The government introduced into evidence a blank copy of the hold harmless agreement referenced in the tow-in policy. It states as follows: "I, _____, understand that I may leave my automobile locked and properly parked on the street, or I may have the City Wrecker remove my automobile to the City Lot at my own expense. I (do or do not) wish to have my automobile removed to the City Lot. In consideration of allowing my automobile to remain parked on the street, I agree to hold the City of Memphis, the Arresting Officers, and the Memphis Police Department harmless from any and all damages or thefts of any kind whatsoever that may occur while my automobile is so parked on the street." Ex. 4. The Magistrate Judge concluded that the hold harmless agreement was not applicable where the arrestee's vehicle is towed, as was the case here.

towed to the city impound lot.[7]

## C. Arrival of Defendant's Relatives at the Scene

At some point during the stop, several individuals approached the officers, including Graham's brother, Jernard Graham, and his cousin, Michael Graham. The officers testified that these individuals did not appear at the scene until after the decision was made to tow the Mercedes and after the officers had found the firearms.[8] Specifically, Officer Dawson testified that other individuals arrived on the scene "after we had discovered the two handguns in the back seat and we had Mr. Graham in custody and we were finishing up our paperwork and waiting on the wrecker to show up."[9] Officer Dawson continued:

**Q.** Now, there was testimony about individuals coming to the scene, correct?

**A.** Yes, ma'am.

**Q.** Individuals that you had not had any contact prior to this incident, correct?

**A.** Correct.

**Q.** And at the time these individuals were coming to the scene, had you already conducted a search?

**A.** Yes, ma'am

**Q.** And as displayed in Exhibit 2, had you already recovered the firearms?

**A.** Yes, ma'am.

---

[7] The receipt attached to the tow ticket shows that an individual named Ayesh Hatin picked up the vehicle from the lot on March 10, 2014. Graham testified that he purchased the vehicle from Hatin and that the previous owner was Isces Williams.

[8] Officer Scarborough testified that at the beginning of the traffic stop, he observed an elderly man standing outside a residence several houses down from the scene of the stop. However, there is no evidence that this man was connected to Johnny Graham, Jernard Graham, or Michael Graham.

[9] Hr'g Tr. Vol. I at 30.

**Q.** Were they placed on the hood of the car?

**A.** Not when the subjects were walking up, we had them inside the patrol vehicle.

**Q.** You had already removed those from the vehicle?

**A.** Yes, ma'am.

**Q.** But all the items that were the subject -- or which is the subject of this motion to suppress, these two firearms had already been recovered by you?

**A.** Yes, ma'am.[10]

. . . . .

**Q.** Officer Dawson, the individuals, how many did you say there were that were walking up and down?

**A.** Approximately five.

**Q.** About five. When did you first notice them?

**A.** As I was walking around the vehicle making sure we had gotten everything or seen everything we needed to see out of the vehicle. I was typing the narrative on the report, filling in the information for the arrest ticket.

**Q.** Okay. So when you first pull over Johnny Graham and he stops at the corner of Redvers and Wagon Wheel, there are not any individuals outside there at that very moment?

**A.** That's correct.

**Q.** And when you are talking to Johnny Graham while he's still seated in the driver's seat of the vehicle and Officer Scarborough is on the passenger's side, do you see any individuals at that point?

**A.** No, sir.

**Q.** After you put the handcuffs on Johnny Graham and escort him to the squad car, at that point, did you see any individuals?

**A.** No, sir.

---

[10] Hr'g Tr. Vol. I at 96-97.

**Q.** And then while Johnny Graham was in the back of the squad car, that's when you and Officer Scarborough proceeded to do the search of the vehicle, right, leading up to the tow?

**A.** No, we called for the tow first and then began the inventory.

**Q.** While you were doing the inventory, before the wrecker arrived, did you notice any individuals at that point?

**A.** No, sir.

**Q.** And after you had completed the inventory, taken all the crime scene photos and other pictures that we introduced earlier, while you were taking those pictures, did you see anybody?

**A.** While I was taking the photos, no.

**Q.** So when the individual, maybe it was more than one that came up to you and said something to the effect of I know Mr. Graham, what's going on -- excuse me -- when did that happen exactly, where were you at that moment?

**A.** I was standing next to the squad car typing the report.

**Q.** Okay. And Officer Scarborough was where?

**A.** He was inside the vehicle.

**Q.** And Johnny Graham was in the back seat of the vehicle?

**A.** Yes, sir.

**Q.** And this is before the other officers had arrived, right?

**A.** After.

**Q.** It was after the other officers arrived. So it's possible that the other officers had had some interaction with those other individuals earlier?

**A.** It's possible.[11]

---

[11] Hr'g Tr. Vol. I 104-05.

Officer Scarborough testified regarding the timing of the individuals' arrival on the scene as follows:

> **Q.** Okay. And while you are searching the vehicle and logging things down, did you see any other individuals come up to the car and talk to you or Officer Dawson or Officer Montgomery?
>
> **A.** I believe it was after that, after we had already searched the stuff, people were coming by.[12]

Officer Montgomery also testified that these individuals did not arrive on the scene until after the inventory search was completed:

> **Q.** So many things going on, what else was going on? Were you aware of any other individuals, other people that were around at that time?
>
> **A.** At the time that I got there and saw them put him in the car, no.
>
> **Q.** When did you first see other people walking around and on the scene?
>
> **A.** We had already inventoried the car and inventoried the contents and found the weapons in there and then secured them and then sat back down in the car. At some point, somebody came up and tried to speak to Officer Dawson in his car.[13]

According to the officers, once the individuals arrived on the scene, some of them began to ask the officers about the traffic stop and Graham's arrest.  Officer Dawson testified as follows:

> **Q.** All right. Let's talk about the individuals you said were walking up and down the streets, how many people did you see from the time you were interacting with Mr. Johnny Graham both at his vehicle and then later, I suppose, when he was in the back of the squad car, how many individuals were walking up and down the street?
>
> **A.** I would say around five or six.

---

[12] Hr'g Tr. Vol. II at 34.

[13] Hr'g Tr. Vol. I at 125.

**Q.** And describe these individuals to us.

**A.** Male black subjects dressed as most people in that neighborhood dress.

**Q.** Okay. But I mean did they approach you and talk to you at all?

**A.** They asked what was going on. They said, hey, I know this guy, what have you got him in the back seat for, can I talk to him.

**Q.** Okay. So did they identify who they were, though, did they say I am so and so?

**A.** No.

**Q.** And did Mr. Graham, did he say, hey, that's so and so, did he ever tell you who that person is?

**A.** Not to me, no.

**Q.** Okay. When the individuals came up to you and said -- and questioned you about what was going on, was Johnny Graham already in the back of the squad car?

**A.** Yes.

**Q.** And at that point, the windows up, down, do you remember?

**A.** In the squad car?

**Q.** Yeah.

**A.** They were up.

**Q.** They were up. Is it your testimony that you never had a conversation with Mr. Graham at all about who those people were?

**A.** I don't remember having a conversation.

. . . . .

**Q.** Okay. To your knowledge, did Officer Scarborough ever talk with those individuals?

**A.** Yes, sir.

**Q.** He did?

**A.** Yes, sir.

**Q.** Do you know what that conversation entailed?

**A.** He told them to clear the scene.

**Q.** He told them to get lost?

**A.** Yes, sir.[14]

At that point, Officer Dawson testified that the individuals left the immediate location of the arrest and "then basically prowled back and forth the entire time of the stop."[15] Officer Montgomery heard one of the individuals ask Officer Dawson if he could take Graham's vehicle from the scene, and Officer Dawson told him that he could not. According to Officer Montgomery, the individuals then gathered at a neighbor's house while the officers waited for the tow truck.

Contrary to the testimony of the officers, the defense witnesses testified that they approached the officers before Graham was placed in the patrol car, that prior to the inventory search the defendant's brother Jernard Graham asked the officers if he could take possession of the Mercedes, and that Johnny Graham asked the officers to allow Jernard Graham to take the vehicle. Jernard Graham testified that he lived at 2504 Rammesses with Defendant and their cousin Christopher Graham.[16] Jernard Graham was in his bedroom on the morning of March 7 when Christopher Graham told him that the police had pulled over the defendant around the corner. Jernard Graham testified that he and Christopher Graham walked to the corner of Wagon

---

[14] Hr'g Tr. Vol. I at 83-89.

[15] Hr'g Tr. Vol. I at 90.

[16] The arrest ticket identified Graham's address as 2504 Rammesses, approximately one block away from the scene of his arrest.

Wheel Drive and Redvers Avenue, where Jernard saw Johnny Graham standing outside of Officer Dawson's patrol car, in the process of being arrested. Jernard Graham asked one of the officers what Johnny Graham was being arrested for, to which the officer responded, "he is a big boy, he can handle his own issues, you go ahead on."[17] Johnny Graham testified that he told the officers that Jernard was his brother when Jernard Graham initially approached the officers. Jernard Graham then walked to a neighbor's house across the street and observed the arrest from a distance.

About thirty minutes to an hour later, Jernard Graham once again approached the officers and asked them if he could take the car so that it would not be impounded. The officers told him that he could not. According to Jernard Graham, the officers did not search the vehicle until after they had told him that he could not take the vehicle. Johnny, Jernard, and Michael Graham all testified that the family members arrived on the scene before the officers searched the Mercedes.

Confronted with the conflicting testimony about whether Defendant was wearing a seatbelt and the timing of Defendant's arrest and the inventory search, the Magistrate Judge credited the testimony of the Memphis police officers that Defendant was not wearing a seatbelt and that Defendant's family members did not arrive on the scene until after the officers had made the decision to tow the vehicle and after the firearms were found in the backpack. The Magistrate Judge found the testimony of the defense witnesses to be not credible.

The Magistrate Judge credited the testimony of Officer Dawson and found the testimony of Defendant and his family members to be not credible. The Magistrate Judge has proposed

---

[17] Hr'g Tr. Vol. II at 50.

that the Court find that Defendant was not wearing a seatbelt, that the car was not legally parked at the time of the traffic stop, that the officers made the decision to tow the car and called for a tow truck before Defendant's family members arrived at the scene, and that having decided to tow the vehicle, the officers conducted a proper inventory search of the car. Therefore, the Magistrate Judge has recommended that the Court conclude no violation of the Fourth Amendment occurred.

**D. Evidentiary Hearing Before the Court**

At the May 25, 2015 hearing before the Court, Defendant submitted and played police dispatch recordings from the morning of the arrest.[18] The dispatch recordings reflected that on the date of Defendant's arrest, the officers first called in the arrest to dispatch at 8:41 a.m. Approximately five minutes and 25 second later, that is, at or about 8:46 a.m., one of the officers remarked to the dispatcher that some of Defendant's family members had walked up to the scene. Officer Dawson was then called to the stand to authenticate the recordings and offer additional testimony.

According to Officer Dawson, the officer heard on the recordings was his partner that day Officer Scarborough. At the time the officers first called in the arrest to dispatch, Defendant was already under arrest and secured in the back of the patrol car, and Dawson had discovered the firearms and was completing his inventory of the vehicle. Officer Scarborough had called in the arrest to dispatch and requested information on the vehicle in order to complete the tow ticket. On cross-examination, Officer Dawson testified that he had recovered the backpack after he

_____

[18] Counsel for Defendant argued that the recordings called into question Officer Dawson's testimony about the sequence and timing of events surrounding the inventory search of the Mercedes and the officers' decision to tow the vehicle. The United States did not object to the admission of the compact disc containing the recordings. It is noted that Defendant had not requested and did not receive these recordings until December 2014, after the Magistrate Judge

made the decision to tow the car, and all in the first five minutes of the traffic stop. The MPD event chronology first mentioned towing the vehicle at 9:55 a.m., more than an hour after the officers had called in the arrest. Officer Dawson explained that he had instructed Officer Scarborough to call for the tow and that the call was not placed before Officer Dawson looked in the backpack holding the two firearms.

In response to questions from the Court, Officer Dawson stated that he had discretion about whether to tow the vehicle and that he decided that it was better to continue with the tow even after Defendant's family members made the scene of the arrest. On cross-examination from this line of questioning, Officer Dawson explained that the MPD tow policy granted him discretion and that his training and experience informed his discretion. Officer Dawson conceded that MPD policy required him to explain to Defendant the options for his vehicle before a decision to tow was made and that this policy was not followed in this case. On re-direct, Officer Dawson testified that the vehicle was illegally parked and no one was initially on the scene to move the vehicle for Defendant. The event chronology showed that the officers requested a wrecker at 9:33 a.m., even though dispatch did not call for a tow until 9:55 a.m. Officer Dawson further stated that he would not have released the vehicle to a family member because it was registered in the name of another person and lacked proof of insurance. The MPD policy required Dawson to obtain Defendant's signature on a hold-harmless agreement that only the owner of the vehicle could sign. On re-cross, Officer Dawson admitted that he had no information about whether Defendant had consent from the owner to operate the vehicle. The vehicle was not reported stolen and had not been involved in a reported crime. Officer Dawson did not obtain a signed consent form from Defendant to search the vehicle.

had conducted a hearing on the Motion to Suppress.

The Court next heard testimony from Defendant's federal probation officer Edward Shaw. Shaw testified that he received a call from Officer Dawson on March 7, 2014, on the morning of Defendant's arrest. Dawson's first call to Shaw reported the stop and mentioned the recent burglaries in the area and the presence of a television in the back of Defendant's car. According to Shaw, Dawson inquired about whether he needed a warrant to search the car. Shaw explained to the Court that upon information and belief, individuals on probation from the state of Tennessee are subject to search without a warrant. Shaw also testified that Dawson never mentioned that Defendant was under arrest or that the police had found weapons, only that he was being held in the back of a patrol car. Shaw did inform Officer Dawson that Defendant had a prior firearms conviction. But Shaw denied that he ever told Officer Dawson he would likely find weapons in the car. Shaw later received a second call from Officer Dawson to report that officers had found two firearms in the car and Defendant was arrested. Shaw explained that he did not record the times of the two calls and that his notes on the calls were made either the same day or within a few days of the calls. Shaw testified that the second call came anywhere from 30 minutes to an hour after the first call.

Following Shaw's testimony, Officer Dawson was called back to the stand. Officer Dawson testified that Defendant had informed him about his federal supervision status during the initial traffic stop. When Officer Dawson ran Defendant's id card, he confirmed that Defendant was on federal supervision and was provided with contact information for Mr. Shaw. Officer Dawson then called Shaw and informed him Defendant was in custody. Officer Dawson testified that he made this first call to Shaw "early on" in the arrest and before he conducted the search of Defendant's car. Officer Dawson testified that Shaw cautioned him Defendant was probably armed. Officer Dawson confirmed that he made a second call to Shaw to advise him

Defendant had been arrested and two firearms were located in the car. On cross-examination, Officer Dawson first testified that he could not remember whether he called Shaw before or after he made the decision to tow and inventory the car. Later on cross, Officer Dawson stated that he made the decision after he spoke to Shaw. Officer Dawson denied that he asked Shaw about the need for a warrant. Officer Dawson also stated that he could not see the contents of the bag in plain view.

### III. Defendant's Arguments and Objections to the Recommended Holding

In his Motion to Suppress, Defendant argues that the firearms were seized in violation of the Fourth Amendment. Defendant contends that the officers lacked any reasonable suspicion Defendant had committed a traffic violation. As factual matter, Defendant objects to the Magistrate Judge's proposed finding that Defendant was not wearing a seatbelt at the time of the stop. Even assuming that the traffic stop was justified, the officers improperly searched the vehicle. Defendant argues that the search was not part of a valid inventory search.[19] Defendant's vehicle was legally parked within 12 inches of the curb, and the car was not needed as evidence. The officers also failed to explain to Defendant that he had the option of allowing a third-party to move the vehicle. Based on the testimony of Defendant and his family members at the hearing before the Magistrate Judge, Defendant contends that family members were present at the scene before the vehicle was towed. Defendant cites for support the dispatch recordings, which show that a family member was present within minutes of the traffic stop and Defendant's arrest.

In his final brief on the suppression issue, Defendant highlights inconsistencies in Officer

---

[19] Defendant also argues that the search was not a proper search incident to his arrest. It appears to the Court that there is no real dispute on this point. As such, the Court need not decide whether the search was justifiable as a search incident to arrest.

Dawson's testimony at the suppression hearing before the Magistrate Judge and his testimony at the evidentiary hearing before the Court, specifically about the timing and sequence of the call for the tow truck and the inventory search. While Officer Dawson had previously testified that a call for a tow truck was made before the inventory search occurred, Officer Dawson testified more recently that the inventory search occurred before the tow truck was called. Defendant further argues that the testimony of the probation officer shows the search of the vehicle was not an inventory search but an investigative search and that Officer Dawson wished to circumvent the warrant requirement. Shaw's testimony also tends to show that Officer Dawson had not conducted the inventory search and discovered the firearms when he first called Shaw. In light of the inconsistencies in Officer Dawson's two sets of testimony and other new evidence the Court received at the evidentiary hearing, Defendant argues the Court should not adopt the Magistrate Judge's proposed findings. Therefore, the Court should hold that the police's search of the vehicle was not proper.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636, the Court may refer a motion to suppress in a criminal matter to a magistrate judge for the purpose of conducting an evidentiary hearing and to submit proposed findings of fact and recommendations for the disposition of the motion.[20] The Court must "make a *de novo* determination of those portions of the report or specific proposed findings or recommendations to which objection is made."[21] However, the Court is not required to conduct *de novo* evidentiary hearing as part of its *de novo* review.[22] After reviewing the

---

[20] 28 U.S.C. § 636(b)(1)(B).

[21] § 636(b)(1)(C).

[22] *United States v. Raddatz*, 447 U.S. 667, 674 (1980).

evidence, the Court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge.[23]   Moreover, the Court need not review, under a *de novo* or any other standard, those aspects of the report and recommendation to which no specific objection is made.[24]   Rather, the Court may adopt the findings and rulings of the magistrate judge to which no specific objection is filed.[25]

## ANALYSIS

### I. Traffic Stop

The first issue presented is whether the officers had reasonable suspicion that Defendant was committing a crime when they pulled him over and conducted a traffic stop.  The Magistrate Judge credited the testimony of Officer Dawson and found that Defendant was not wearing a seatbelt at the time the officers stopped him.  The Magistrate Judge "had the opportunity to view the witness on the stand and assess his demeanor"[26] and thus was "in the better position to assess the credibility of witnesses" he heard during the evidentiary hearing.[27]   "Credibility determinations of the magistrate judge who personally listened to the testimony of a witness should be accepted by a district judge unless in his *de novo* review of the record he finds a reason

---

[23] § 636(b)(1)(C).

[24] *Thomas v. Arn,* 474 U.S. 140, 150 (1985).

[25] *Id.* at 151.

[26] *Peveler v. United States,* 269 F.3d 693, 702 (6th Cir. 2001); *see also Moss v. Hofbauer,* 286 F.3d 851, 868 (6th Cir. 2002).

[27] *United States v. Woodruff*, 830 F. Supp. 2d 390, 402 (W.D. Tenn. 2011) (Mays, J.) (quoting *United States v. Robinson,* No. 1:07–CR–1, 2007 WL 2138635, at *1(E.D. Tenn. July 23, 2007)).

to question the magistrate judge's assessment."[28]  Having reviewed the testimony received by the Magistrate Judge on this issue, the Court hereby adopts the Magistrate Judge's proposed finding that Defendant was not in fact wearing his seatbelt.  The Court also adopts the Magistrate Judge's recommended conclusion that the officers had reasonable suspicion to stop Defendant and perform an investigatory stop.

The Court next adopts the Magistrate Judge's conclusion that once Defendant was placed under arrest, Defendant's car was not legally parked. Officer Dawson explained that the vehicle was parked illegally because the vehicle was more then 12 inches from the curb.  The Magistrate Judge accepted Officer Dawson's testimony and found that Defendant's car was parked illegally. Defendant has raised an objection to this finding, citing an exhibit created by former counsel for Defendant that purports to show the car was parked within 12 inches of the curb.  And yet, Defendant acknowledges that his exhibit also "demonstrates that [the car] may have been more than 12 inches from the curb, but only because at [one] specific point in the curb it curves as Wagon Wheel intersects with Redvers."[29]  The Court finds Defendant's proof inconclusive on the issue of whether the vehicle was parked more than 12 inches from the curb and therefore insufficient to disturb the Magistrate Judge's credibility finding.[30]  Therefore, the Court adopts

---

[28] *United States v. Brown,* No. 1:07–CR–9, 2007 WL 1345463, at *1 (E.D. Tenn. May 7, 2007); *see also United States v. Tyler,* 2:10-CR-20124-STA, 2011 WL 2551177 (W.D. Tenn. June 27, 2011); *United States v. Tuggle,* No. 2:10–cr–20042–JPM–tmp, 2011 WL 692812, at *1 (W.D. Tenn. Feb. 18, 2011) (quoting *United States v. Freeman,* No. 08–5677, 2010 WL 4244268, at *9 (6th Cir. Oct. 19, 2010)).

[29] Def.'s Mot. to Suppl. 4 (ECF No. 54).

[30] Moreover, impoundment is properly a matter of discretion, not mathematical precision. "Discretion as to impoundment is permissible so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *United States v. Jackson,* 682 F.3d 448, 454 (6th Cir. 2012) (quoting *Colorado v. Bertine,* 479 U.S. 367, 375–376 (1987)).  Memphis City Ordinance 11-40-26(A) requires impoundment but only after an officers deems impoundment necessary under the circumstances:

the Magistrate Judge's finding that Defendant's car was illegally parked based on the testimony of Officer Dawson.

## II. The Inventory Search

Having concluded that Defendant's car was illegally parked, the Court now turns to the primary issue of contention in this case, whether the inventory search of the car violated the Fourth Amendment. "It is settled law that the police may conduct an inventory search of an automobile that is being impounded without running afoul of the Fourth Amendment."[31] "[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment."[32] "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage."[33] A valid inventory "must be conducted according to standard police procedures" and cannot be "undertaken for purposes of investigation"[34] or as "a ruse for a general rummaging in order to discover incriminating evidence."[35] By the same token, "the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search."[36] Evidence that the

---

"whenever a motor vehicle . . . is found parked in violation of any of the provisions of this title, and it becomes necessary, in the opinion of the police division, to remove such vehicle from the street as an obstruction, such vehicle shall be towed . . . ."

[31] *United States v. Jackson*, 682 F.3d 448, 455 (6th Cir. 2012).

[32] *Bertine,* 479 U.S. at 371 (1987).

[33] *Whren v. United States*, 517 U.S. 806, 811 n.1 (1996).

[34] *United States v. Hockenberry*, 730 F.3d 645, 659 (6th Cir. 2013) (citation omitted).

[35] *Florida v. Wells,* 495 U.S. 1, 4 (1990).

[36] *Hockenberry*, 730 F.3d at 659 (citation omitted).

"police acted in bad faith or for the sole purpose of investigation" will render a search invalid.[37] As in any case, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'"[38]

The Court holds that under all of the circumstances the search of Defendant's car was unreasonable and therefore violated Defendant's Fourth Amendment rights. The weight of the evidence supports the conclusion that the police undertook the search of Defendant's car for the purpose of investigation. Based on the testimony presented to the Magistrate Judge at the September 2014 suppression hearing and the evidence presented to the Court at the May 2015 evidentiary hearing, the Court makes the following findings of fact surrounding the search of Defendant's car. The officers placed Defendant under arrest shortly after initiating the traffic stop, and Officer Scarborough called in the arrest at 8:41 a.m. Within that short span of time, the officers had pulled Defendant over, learned that he was driving on a suspended license and was under federal supervision, placed him under arrest, and put him in the back of their patrol car.

At that point Officer Dawson obtained contact information for Defendant's federal probation officer Edward Shaw and telephoned him. Officer Dawson informed Shaw that Defendant was "in the back of the car," presumably under arrest, for driving on a suspended license. Officer Dawson also reported that police were investigating a series of home burglaries in the area (burglaries occurring in the early morning hours), and a television and a DVD player were in plain view in the back seat of Defendant's car. Officer Dawson questioned Shaw about whether he needed a warrant to search the car in light of Defendant's federal supervision. Officer Dawson obtained information from Shaw about Defendant's health status and prior

---

[37] *United States v. Vite–Espinoza,* 342 F.3d 462, 470 (6th Cir. 2003) (citing *Bertine*, 479 U.S. at 372–73).

[38] *Rodriguez v. United States*, 135 S. Ct. 1609, 1617 (2015) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

firearms offense. Notably, at the time of the call to Shaw, Officer Dawson had not yet searched the vehicle and discovered the two handguns in a backpack. At approximately 8:46 a.m., an unidentified member of Defendant's family showed up at the scene and addressed the officers. The Court finds that all of these events, including Officer Dawson's call to Shaw, took place within a short period of time after the officers had pulled Defendant over.

Officer Dawson has maintained throughout that he only searched the car as part of an inventory and that he discovered the firearms before any of Defendant's family members made the scene. In fact, Officer Dawson testified at the May 2015 hearing that he had already recovered the firearms when Officer Scarborough called in the arrest at 8:41 a.m. However, the Court finds a number of material discrepancies about the timing of the officers' decision to tow the car and conduct the inventory search. The officers testified before the Magistrate Judge that prior to any of Defendant's family members coming to the scene, Officer Dawson had called for a tow truck and performed an inventory search of the Mercedes while waiting for the tow truck to arrive. The proof from the evidentiary hearing, however, was that Officer Scarborough, and not Officer Dawson, called for the tow and did so only after a member of Defendant's family had arrived. The event chronology, which was not introduced at the suppression hearing before the Magistrate Judge, shows that a family member made contact with the officers around 8:46 a.m. Officer Scarborough called for the tow truck at 9:33 a.m., some 47 minutes later. The Court finds that this new chronology is inconsistent with the officers' testimony before the Magistrate Judge and calls into doubt the evidence that Officer Dawson had discovered the firearms some time after the officers had called for a tow truck.

In addition to the question about when the officers called for the tow truck, the Court

finds Officer Dawson's more recent testimony about the timing and sequence of events to be somewhat problematic. Officer Dawson testified that he completed the search of the car before any of Defendant's family members walked up. In fact, at the May 2015 hearing, Officer Dawson specified that he had completed the search by the time Officer Scarborough had called in the arrest at 8:41 a.m., a matter of five minutes after the traffic stop. The event chronology showed that a family member walked up and contacted the officers at 8:46 a.m., some ten minutes after the officers had pulled Defendant over. In other words, accepting all of Officer Dawson's testimony as true, the officers would have completed all of the following events in as little as five minutes and in no more ten minutes: (1) initiated the traffic stop, (2) questioned Defendant and obtained his id, (3) placed Defendant under arrest and secured him in the back of the patrol car, (4) called in the arrest to dispatch, (5) obtained contact information for Defendant's probation officer, (6) called the probation officer and inquired about Defendant's supervised release status, (7) verified that Defendant was not the registered owner of the car, (8) made the decision to tow the car, (9) searched the vehicle, (10) found the firearms in a backpack, and (11) were "finishing up" paperwork on the arrest and tow when the first of Defendant's family members approached at 8:46 a.m. The Court finds it highly improbable that the officers could complete so many tasks in so little time. As such, the Court cannot accept Officer Dawson's testimony about the timing and sequence of the events, including his search of Defendant's car.

The only facts the Court can find with any degree of confidence are that Defendant was under arrest and the officers' investigation underway by 8:41 a.m. and that a member of Defendant's family walked up to the scene by 8:46 a.m. And while the officers may have contemplated impounding the car at that early time, the only credible evidence before the Court

is that the officers did not call for a tow truck until 9:33 a.m. This leaves the question of when Officer Dawson actually searched the car and found the weapons. Officer Dawson testified before the Magistrate Judge that he found the guns only after the officers had called for a tow truck but before Defendant's family members had arrived. Officer Dawson testified before the Court that he found the guns within minutes of the arrest at a time before the officers had called for a tow truck and before Defendant's family members had arrived. Under either of these scenarios, the Court holds that a decision to search Defendant's car was unreasonable.

If Officer Dawson had not yet discovered the firearms by 8:46 a.m. when a family member walked up, serious questions arise about whether some alternative to impoundment existed in this case.[39] The fact that Defendant had a family member present on the scene early on in the process is highly probative. Had the officers simply wished to get the car off the street and legally parked, the officers should have complied with MPD's tow-in policy, explained Defendant's options to him, and then decided whether to allow one of the family members to move the car.[40] After all, the traffic stop occurred on a residential street only a short distance

---

[39] In the suppression hearing before the Magistrate Judge, the parties offered conflicting testimony about whether Defendant's family members were present at the scene and available to move the illegally parked car before the police decided to tow it and discovered the guns. Defendant and his family members testified they were present; the officers testified they were not. As previously noted, the Magistrate Judge found Defendant and his family members to be not credible on this point.

However, the Magistrate Judge's credibility finding was supported by the officers' testimony that they had called for a tow truck before they ever searched the car. New evidence, which was not presented to the Magistrate Judge, conflicts with the officers' previous testimony. Officer Dawson has now testified that his search occurred well before the officers requested the tow truck. Furthermore, the dispatch recordings show that a family member had come to the scene and identified himself to the officers at about 8:46 a.m.; whereas, the officers did not call for a tow truck until 9:33 a.m.

[40] At the evidentiary hearing, Officer Dawson was asked by the government whether he would have entrusted the vehicle to a third-party at the scene, knowing that the vehicle was

(about a block) from Defendant's own driveway. Instead, the officers admitted that they did not engage any family members at the scene, failed to explain to Defendant that he had the option of allowing a third party to move the car, and did not contact a supervisor prior to requesting the tow truck. True, the officers' decision to tow the car did not violate the Fourth Amendment "simply because alternatives to impoundment might [have] exist[ed]."[41] But if Officer Dawson searched the vehicle only after the call for the tow truck, his search took place after Defendant's family was there. It would appear then that the officers pressed ahead with impoundment in spite of the presence of third parties on the scene. The Court holds that under those circumstances a search of the car would be unreasonable.

To the extent that Officer Dawson searched the car within minutes of the arrest, the Court finds that such a search would have been investigatory, and not a standard inventory search. An early search of Defendant's car is consistent with the officers' pursuit of a burglary investigation and the decision to search the vehicle for possible evidence of wrongdoing. The circumstances of the traffic stop led the officers to suspect Defendant of being the burglar they were on the lookout for in this area. The fact that Defendant was driving a car not registered to him and had a television and DVD player in the backseat raised Officer Dawson's suspicion that Defendant might be in possession of stolen goods. Officer Dawson's call to Defendant's probation officer Mr. Shaw further suggests that Officer Dawson suspected Defendant of some sort of criminal

---

registered to someone other than Defendant and Defendant had no proof of insurance. Officer Dawson testified that he would not have. This testimony, however, was purely hypothetical and does not reflect what actually occurred. The officers simply maintained that the vehicle was parked illegally and that there was no family member present at the time the decision to tow was made. For the reasons already explained, the event chronology itself calls this testimony into doubt. Otherwise, the United States has not argued that the evidence would have been inevitably discovered as part of a proper inventory search or under some other exception to the warrant requirement.

activity. Officer Dawson reported to Shaw that Defendant was stopped with a television and DVD player in his possession in a precinct experiencing a rash of burglaries. Most tellingly, Officer Dawson's conversation with Mr. Shaw shows that he was already considering ways to conduct a warrantless search of the car. Officer Dawson questioned Shaw about the need for a warrant to search the car, apparently under the assumption that a warrant was not required where the arrestee was on federal probation. All of these facts support the inference that Officer Dawson wanted to search Defendant's car for the purpose of investigating a crime, and not just to complete the inventory process before impounding the car. The Court holds that under those circumstances the search would not be a valid inventory search.

Taken together with the fact that Defendant's car was parked on a residential street (albeit illegally) within a short distance of his own driveway and with members of his family present only minutes after the arrest, it is not clear to the Court why the officers' decision to impound the car was reasonable under the specific circumstances of this case. The evidence points to the fact that the officers had decided to search the car, specifically the television and DVD player in the backseat, as part of an investigation of Defendant's possible burglary activities, and not simply for the purpose of inventorying the contents of the vehicle before they impounded it. The Court concludes then that the search of the car violated Defendant's Fourth Amendment rights. Therefore, Defendant's Motion to Suppress is **GRANTED**.

    **IT IS SO ORDERED.**

                                          **s/ S. Thomas Anderson**
                                          S. THOMAS ANDERSON
                                          UNITED STATES DISTRICT JUDGE

                                          Date: July 6, 2015.

---

[41] *Hockenberry*, 730 F.3d at 658.